UNITED STATES of America,
Plaintiff–Appellee,

v.

Roland Markeith JOHNSON,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven Lamont LEWIS, Defendant–
Appellant.

Nos. 92–5672, 92–5673.

United States Court of Appeals,
Fourth Circuit.

Argued April 15, 1994.

Decided April 27, 1995.

**ARGUED:** Francis M. Lawrence, St. John, Bowling & Lawrence, Charlottesville, VA, for appellant Johnson; David Leonard Heilberg, Charlottesville, VA, for appellant Lewis. Donald Ray Wolthuis, Asst. U.S. Atty., Roanoke, VA, for appellee. **ON BRIEF:** Robert P. Crouch, Jr., U.S. Atty., Roanoke, VA, for appellee.

Before LUTTIG and WILLIAMS, Circuit Judges, and PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge WILLIAMS wrote the opinion, in which Judge LUTTIG concurred. Judge PAYNE wrote a separate concurring opinion.

## OPINION

WILLIAMS, Circuit Judge:

Roland Markeith Johnson and Steven Lamont Lewis appeal their convictions and sentences for participation in a drug conspiracy, in violation of 21 U.S.C. § 846 (1988) (Count One), and engaging in a continuing criminal enterprise (CCE), in violation of 21 U.S.C. § 848 (1988) (Count Two).[1] Appellants appeal their convictions contending, *inter alia,* that: (1) there was insufficient evidence to

---

1. Lewis was also convicted of possession with intent to distribute more than five grams of cocaine base in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(B) (West 1981 & Supp.1994) (Count Three). A search warrant executed at Lewis's residence on October 19, 1990, yielded 24.3 grams of crack. Because he does not specifically challenge that conviction, any objection is waived.

support the jury's finding of either a single conspiracy or a CCE; (2) there was insufficient evidence regarding the quantity of drugs for which they were held accountable; (3) the district court erred in admitting into evidence what Appellants characterize as summary testimony and a chart summarizing the testimony of Appellants' co-conspirators; (4) they cannot be convicted of both a § 846 conspiracy and a § 848 CCE because the former offense is a lesser-included offense of the latter; and (5) the district court made a number of miscellaneous errors. We affirm the district court's judgment on all issues except the conspiracy convictions, which we remand with instructions to vacate.

## I.

An investigation conducted by the Charlottesville/Albemarle (Virginia) Joint Drug Task Force revealed an extensive cocaine base (crack) distribution network in the central Virginia area. On April 30, 1991, the grand jury returned a four-count indictment against eighteen individuals, including Appellants, charging them with participation in a conspiracy to possess with intent to distribute and to distribute crack from the summer of 1988 until March 1991. In addition, Steven Lewis (Lewis), Roland Johnson (Roland), and Kent Murray Johnson (Kent) were charged with maintaining a CCE.

The evidence at trial included the testimony of over twenty-five coconspirators and participants, as well as several detectives, and, considered in the light most favorable to the Government, *United States v. Banks*, 10 F.3d 1044, 1046 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1850, 128 L.Ed.2d 475, *and* —— U.S. ——, 114 S.Ct. 2681, 129 L.Ed.2d 814 (1994), established the following. There were three primary sources or suppliers of the crack: (1) an unidentified source in Washington, D.C.; (2) an individual referred to as "Poncho," from Washington, D.C.; and (3) an individual known as "Caesar," who resided in New

York. The crack was supplied to four individuals—the two Appellants, Kent, and Ivo Pufong—who also supplied crack to each other on occasion.[2] These individuals served as principals or leaders in the conspiracy, and they directed the distribution of crack in the central Virginia area targeted in this investigation. These principals enlisted a number of "lieutenants" who supplied and distributed the crack to street dealers and collected money.

The two and one-half week trial included thirty-seven witnesses for the Government and eight witnesses for Appellants. The jury found Appellants guilty on all counts. Lewis was sentenced to life imprisonment, consisting of 240 months on Count One, the remainder of his life on Count Two, and a concurrent 60 months on Count Three.

Roland was also sentenced to life imprisonment, consisting of ten years on Count One and the remainder of his life on Count Two. Appellants' timely appeals were consolidated by order of this court on October 16, 1992.

## II.

First, Appellants contend that the evidence was insufficient to sustain the jury's finding of either a single conspiracy or a CCE. They also challenge the sufficiency of the evidence to support the quantity of drugs for which each was held accountable. When reviewing a sufficiency of the evidence challenge, we inquire whether "*any* rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original), and we "construe the evidence in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced." *United States v. Giunta*, 925 F.2d 758, 764 (4th Cir.1991).

---

**2.** Pufong was not named in the present indictment. He was charged with conspiracy to distribute cocaine in August 1990, and later pled guilty and was sentenced to 292 months imprisonment prior to this trial. He testified on behalf of the Government in this case that he worked with Roland and fronted him approximately ten ounces of crack from fall 1989 to summer 1990. Pufong did not know Lewis.

### A.

Initially, we must determine whether there was sufficient evidence to support the jury's finding that Steven and Roland were participants in a single conspiracy. Appellants contend that there was no direct link between the alleged ringleaders and, if anything, the evidence established multiple conspiracies, including theirs, operating in competition with each other. We find that there was sufficient evidence to support the jury's finding of a single conspiracy.

"In order to support a conviction for conspiracy, the government must show, first, that a conspiracy existed; then, that the defendant had knowledge of the conspiracy; and finally, that the defendant voluntarily became a part of the conspiracy." *United States v. Bell,* 954 F.2d 232, 236 (4th Cir. 1992). Circumstantial evidence may be used to prove the existence of a conspiracy. *Id.* at 236. Moreover, a defendant can be convicted of conspiracy if the evidence shows a defendant's participation in only one level of the conspiracy charged in the indictment. *See United States v. Hines,* 717 F.2d 1481, 1490 (4th Cir.1983), *cert. denied,* 467 U.S. 1214, 104 S.Ct. 2656, 81 L.Ed.2d 363, *and* 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). In *United States v. Crockett,* 813 F.2d 1310, 1316–17 (4th Cir.), *cert. denied,* 484 U.S. 834, 108 S.Ct. 112, 98 L.Ed.2d 71, this court noted the distinction between a single conspiracy, with different parties joining and leaving at different times, and multiple conspiracies. A single conspiracy exists when "[t]he conspiracy had the same objective, it had the same goal, the same nature, the same geographic spread, the same results, and the same product." *Id.* at 1317.

In this case, all of the defendants named in the indictment participated in some level of the conspiracy. Although some of the participants may have bought drugs from other sources at various times, there is an abundance of evidence establishing a single, ongoing conspiracy between Appellants, Kent, Pufong, and others to distribute crack. The evidence established that Appellants shared some of the same supply sources. For example, Kent was a common link between Roland and Lewis, as demonstrated by Kent's testimony that he supplied crack to both Appellants and they reciprocally supplied crack to him. In addition, "Poncho" supplied both Lewis and Kent, while Pufong supplied both Roland and Kent. Moreover, there is an abundance of evidence that the four principals shared many dealers. For instance, Tori Dade testified that he sold crack for Lewis, Roland, and Kent; Adrian Owens testified that he was supplied by Lewis and Kent; and John Allen testified that he received crack from Lewis and indirectly from Roland through a third party.

Appellants also assert that the four principals either did not know or had minimal contact with each other. They argue that there was no defined organizational structure, mutual dependence, or simultaneous overlap of participants. However, as this court recently stated:

> [O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence. Critically, it is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure; the requisite agreement to act in concert need not result in any such formal structure, indeed frequently, in contemporary drug conspiracies, contemplates and results in only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise....

*Banks,* 10 F.3d at 1054. Given the aforementioned evidence regarding Lewis and Roland and their respective roles in the conspiracy, their contention is without merit.

Finally, Appellants argue that, if anything, the four principals were competitors, not co-conspirators. While the record demonstrates that the principals, including Appellants, shared many sources, distributors, and customers, the fact that drug dealers "may sometimes, or even always, compete for supplies or customers in serving that market does not on that account alone disprove ...

the existence of a single conspiracy to achieve the overall results of their several efforts." *Id.* The absence of any evidence discounting the single conspiracy established by the Government's evidence precludes any support for Appellants' argument of multiple conspiracies.

Accordingly, we reject Appellants' challenge to the sufficiency of the evidence demonstrating a single conspiracy.

### B.

█ Appellants also contest the sufficiency of the evidence to support the jury's finding of a CCE. Appellants focus exclusively on the sufficiency of the evidence to support the jury's finding that each of them was an organizer, supervisor, or manager of five or more persons. 21 U.S.C.A. § 848(c)(2)(A).[3] We find, however, that the evidence, taken in the light most favorable to the Government, is sufficient to support the jury's finding, beyond a reasonable doubt, that both Lewis and Roland supervised or managed at least five individuals during the course of their drug transactions.

"[A] defendant need not fit the label of a 'kingpin' or 'ringleader' to be convicted under § 848." *United States v. Baker,* 10 F.3d 1374, 1409 (9th Cir.1993) (citations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994). Moreover, a CCE may have more than one head. *Id.* As to the numerical requirement of five or more participants, the Government need not prove "that the five individuals were supervised and acted in concert at the same time, or even that

[they] were collectively engaged in at least one specific offense." *United States v. Ricks,* 882 F.2d 885, 891 (4th Cir.1989), *cert. denied,* 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 841 (1990). The Government also need not show that "the defendant[s] ha[d] personal contact with the five persons because organizational authority and responsibility may be delegated." *United States v. Butler,* 885 F.2d 195, 200–01 (4th Cir.1989).

The evidence at trial demonstrated that Lewis and Roland each managed the transportation of large quantities of crack from New York and Washington, D.C., to central Virginia, and distributed that crack to several dealers directly supervised by Appellants. At least sixteen individuals who received and distributed cocaine for Lewis, and seventeen persons who received and distributed cocaine for Johnson, testified at the trial. This evidence sufficiently supports the jury's finding that each Appellant functioned as an organizer, supervisor, or manager of at least five persons.

### C.

█ Appellants next challenge the sufficiency of the evidence regarding the amount of crack, in excess of 1.5 kilograms, for which each was held accountable. Distribution of over 1.5 kilograms of crack is not a substantive element of a CCE, *see* 21 U.S.C.A. § 848(c)(2)(A), but rather is one of the conditions for the mandatory life sentence provision under the CCE statute, 21 U.S.C.A. §§ 848(b)(2)(A), 841(b)(1)(B) (West Supp. 1994).[4] In this case, both Lewis and Roland

---

**3.** The statute provides, in relevant part:

> For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—
> (1) he violates any provision of this subchapter ... the punishment for which is a felony, and
> (2) such violation is a part of a continuing series of violations of this subchapter ...
> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
> (B) from which such person obtains substantial income or resources.
>
> 21 U.S.C.A. § 848(c) (West Supp.1994).

**4.** 21 U.S.C.A. § 848(b) (West Supp.1994) provides in relevant part as follows:

> Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a) of this section if—
> (1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and
> (2)(A) the violation referred to in subsection (d)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title....
>
> 21 U.S.C. § 841(b)(1)(B)(iii) references a quantity of five grams of crack cocaine. Accordingly,

were sentenced to life imprisonment for their CCE convictions based on the jury's determination, beyond a reasonable doubt, that each was accountable for over 1.5 kilograms of crack.

Generally, when determining the applicability of a statutory sentencing provision, the Government must prove the elements of that provision by a preponderance of the evidence. *See United States v. Powell*, 886 F.2d 81, 85 (4th Cir.1989) (drug quantity under 21 U.S.C. § 841(b)(1)(A) "went to the question of [defendant's] sentence, rather than his guilt, [so] the government only had to prove that quantity by a preponderance of the evidence" for sentencing purposes), *cert. denied*, 493 U.S. 1084, 110 S.Ct. 1144, 107 L.Ed.2d 1049 (1990). Here, the trial judge provided the jury with a special verdict form, instructing them to determine whether each of the essential elements of the sentencing provision of § 848(b) had been proven beyond a reasonable doubt. The imposition of this greater burden of proof on the Government, although technically incorrect, further validates the applicability of the life imprisonment sentence, provided sufficient supporting evidence is contained in the record.

The evidence included Kent's testimony that he delivered between 2.78 and 7.5 kilograms of crack to Lewis. Moreover, numerous witnesses testified to receiving a total of between 6.97 and 15.42 kilograms of crack from Lewis. With regard to Roland, the testimony of Kent, Pufong, and Wardell Hillard established that Roland received between 2.78 and 8.94 kilograms of crack. The evidence also demonstrated that Roland distributed between 5.35 and 16.63 kilograms of crack. This evidence is sufficient, under either a beyond a reasonable doubt standard or a preponderance of the evidence standard, to sustain the jury's finding that Lewis and Roland each distributed in excess of 1.5 kilograms of crack.

### III.

Appellants next argue that the district court committed reversible error by (1) allowing Detective Hudson to summarize and extensively explain the testimony given by prior witnesses and (2) admitting into evidence Detective Hudson's organizational chart, as well as foundational testimony supporting the chart. According to Appellants, the decision to admit the testimony and the chart impermissibly allowed the government agent to vouch for the earlier witnesses' uncertain credibility.

Admission of evidence "will not be overturned on appeal unless [the district court's] decision is shown to be arbitrary or irrational." *United States v. Bailey*, 990 F.2d 119, 122 (4th Cir.1993). Furthermore, even if the grounds that the district court gave for admitting the evidence are improper, generally this Court will reverse only if there are no grounds upon which the district court could have properly admitted the evidence. *United States v. Nazemian*, 948 F.2d 522, 530 (9th Cir.1991), *cert. denied*, — U.S. —, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992); *United States v. Cardenas*, 895 F.2d 1338, 1345 (11th Cir.1990) (" 'If the admission was proper on any ground, it is of no consequence that the court might have given the wrong reason for its admission.' ") (quoting *Navajo Freight Lines, Inc. v. Mahaffy*, 174 F.2d 305, 307 (10th Cir.1949)).[5]

At the end of its case-in-chief, the Government called Detective Richard Hudson as a witness to present expert testimony concerning the organization of the drug conspiracy and to summarize the evidence garnered from the Government witnesses who preceded him. To these ends, he offered extended testimony and an organizational chart diagramming drug transactions among members of the conspiracy. The district court qualified Detective Hudson as an expert with regard to the modes of distribution, packaging, weights, prices, and use of narcotics, including crack cocaine, pursuant to Rule 702

300 times that amount equals 1,500 grams or 1.5 kilograms.

**5.** We are aware that in *United States v. Beahm*, 664 F.2d 414 (4th Cir.1981), the majority did not address the admissibility of the challenged evi-

dence in that case on an alternative ground suggested by the dissent. We do not think that *Beahm* in any way affects our decision to affirm on an alternative ground the district court's admission of the challenged evidence in this case.

of the Federal Rules of Evidence. Although neither Johnson nor Lewis specifically objected to this ruling, counsel for Appellants lodged continuing objections as to the scope and nature of Detective Hudson's testimony at various stages of his direct testimony.

While we are concerned with the Government's practice of offering summary witness testimony and charts into evidence in federal drug prosecutions, we conclude that the district court in this case did not commit reversible error in admitting the testimony of Detective Hudson and the organizational chart. We base this conclusion, however, on a different ground than that relied upon by the district court: Rule 611(a) of the Federal Rules of Evidence. Because the issues surrounding the admissibility of the organizational chart call for a more thorough review of the contours of Rule 611(a), as well as the rules relied upon by the district court, we turn first to the admissibility of the chart.

### A.

 The organizational chart was essentially a summary exhibit reflecting Detective Hudson's compilation of testimony already adduced at trial. Specifically, the chart listed three high-level sources of crack, and below them, the names of the four principals, including Appellants. Arrows on the chart illustrated a connection to each principal's source, which was any of the three suppliers or one of the other principals. The name of each principal headed a column of other names. Names printed in black represented persons who, based on the testimony, either bought crack from or distributed crack for only one principal. Names printed in red represented persons who worked for more than one principal. Both Appellants stipulated that the column of names under their respective names accurately depicted the testimony of other witnesses who had allegedly received crack from them. Moreover, the

Government and Detective Hudson conceded that Hudson prepared the chart in the light most favorable to the Government, reflecting Hudson's judgment as to the credibility of witnesses.

 Rule 703 of the Federal Rules of Evidence [6] allows an expert witness to base his opinion upon earlier trial testimony. However, this Rule does not afford the expert unlimited license to testify or present a chart in a manner that simply summarizes the testimony of others without first relating that testimony to some "specialized knowledge" on the expert's part as required under Rule 702 of the Federal Rules of Evidence.[7] *See, e.g., Baker,* 10 F.3d at 1411–12. The common thread throughout the foundational testimony in support of the chart is Detective Hudson's reliance on the prior testimony of other witnesses to explain not only the placement of the names, but also to explain the placement of the different colors and directions of the arrows on the chart:

Q: Now, there is also an orange arched arrow with a head on both ends going between Steve Lewis and Kent Johnson. What does that arrow represent and what is that based on in the evidence?

A: That arrow is indicative of cocaine base or crack cocaine passing from Steven Lewis to Kent Johnson and also on a separate occasion from Kent Johnson to Steven Lewis on a number of times. The evidence has been from Kent Johnson's testimony that he sold or fronted Steve Lewis crack cocaine and also that he obtained crack cocaine from Steve Lewis. That's why it's a two headed arrow because the flow of crack in that specific instance goes both ways, although it is a separate transaction.

---

6. Rule 703 states: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

7. Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

(J.A. 1019.) While the chart likely assisted the jury in organizing the various transactions that took place, the above testimony does not indicate in any way that Detective Hudson used any "specialized knowledge" as required under Rule 702. Accordingly, Rule 702 does not provide a basis for admitting the organizational chart or the foundational testimony in support of the chart.[8]

We conclude, however, that pursuant to Rule 611(a) of the Federal Rules of Evidence, the district court was within its discretion in allowing the summary chart and accompanying foundational testimony into evidence. Rule 611(a) provides, in relevant part:

> The [district] court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time. . . .

Because there appears to be a lack of cohesion among federal courts as to the guiding principles involved in reviewing the admissibility of such a summary chart, we must look closely at the application of Rule 611(a) in this case.

A number of federal courts have looked to Rule 611(a) as the means of reviewing whether a district court has properly admitted a summary chart into evidence. *See, e.g., Baker*, 10 F.3d at 1412; *United States v. Pinto*, 850 F.2d 927, 935–36 (2d Cir.), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143, *and* 488 U.S. 932, 109 S.Ct. 323, 102 L.Ed.2d 341 (1988); *United States v. Scales*, 594 F.2d 558, 563–64 (6th Cir.1979) (alternative holding), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979); *see also* 5 Jack B. Weinstein and Margaret A. Berger, *Wein-*

*stein's Evidence* ¶ 1006[03] (1992) (a summary chart "prepared by a witness from personal knowledge to assist the jury in understanding or remembering a mass of details . . . is admissible, not under Rule 1006, but under such general principles of good sense as are embodied in Rule 611(a)"). The decision whether to admit such summary evidence pursuant to Rule 611(a) is left to the sound discretion of the district court. *Pinto*, 850 F.2d 927, 935–36; *see also Bailey*, 990 F.2d at 122 (district court's admission of evidence "will not be overturned on appeal unless its decision is shown to be arbitrary or irrational").

We look to the Second Circuit's decision in *Pinto* as a good example of the manner in which a court should apply Rule 611(a) in the context of the admissibility of a summary chart. That case involved the prosecution of more than ten defendants for conspiracy to import more than 150 kilograms of cocaine. As part of its case-in-chief, the government introduced into evidence summary charts reflecting numerous wiretaps and telephone calls, the individuals participating in the telephone conversations, the numbers used, and the locations at which telephone calls were placed or received. In upholding the district court's decision to admit the summary charts, the Second Circuit focused on two aspects of their presentation at trial. First, the court held that the district court acted within its discretion in determining that admission of the charts into evidence would be helpful to the jury. *Id.* Second, the court noted that, as to "the possibility that the jury would accept such summaries as documentary fact" because they were entered into evidence, the district court properly "repeatedly reminded the jurors of their responsibility to determine

---

8. Neither would the organizational chart be admissible under Rule 1006 of the Federal Rules of Evidence. Rule 1006 provides, in relevant part: The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

This case did not involve "voluminous writings, recordings, or photographs" that would permit such a composite exhibit; instead, the organization and content of the chart was based primarily on the earlier *testimony* as to each of the co-conspirators. *Baker*, 10 F.3d at 1411; *but see United States v. Winn*, 948 F.2d 145, 158 (5th Cir.1991) (Rule 1006 should be read broadly to include charts and summaries), *cert. denied*, 503 U.S. 976, 112 S.Ct. 1599, 118 L.Ed.2d 313 (1992).

whether the charts accurately reflected the evidence presented." *Id.*

The summary exhibit cases decided under Rule 611(a) reveal some guiding principles for reviewing a district court's admission of a chart into evidence. First, we consider whether the summary chart aids the jury in ascertaining the truth. *Pinto,* 850 F.2d at 935; *Scales,* 594 F.2d at 563. In making this determination, we look to the length of the trial, the complexity of the case, and the accompanying confusion that a large number of witnesses and exhibits may generate for the jury. Second, applying what is essentially an analysis under Rule 403 of the Federal Rules of Evidence,[9] we consider the possible prejudice that would result to the defendant by allowing the summary chart into evidence. In practice, a number of courts considering the issue have developed safeguards to minimize possible prejudice to a defendant by (1) ensuring that the individual who prepared the chart—as well as the evidence upon which the preparer relied—was available for cross-examination by the defendant to test the competence of the evidence as presented in the summary chart, *Baker,* 10 F.3d at 1412, and, (2) ensuring that the district court properly instructed the jury concerning the manner in which they were to consider the charts. *Id.; Pinto,* 850 F.2d at 935.

Before turning to the application of Rule 611(a) in this case, we pause to note a somewhat confusing holding that appears in some cases considering the admissibility of summary charts. In discussing the propriety of offering a limiting instruction to the jury to minimize possible prejudice, some courts have seemingly alluded to whether the summary chart should be formally admitted into evidence: "This danger [of prejudice to the

defendant] has led to the requirement of 'guarding instructions' to the effect that the chart is not itself evidence but is only an aid in evaluating the evidence." *Scales,* 594 F.2d at 564; *see also United States v. Casamento,* 887 F.2d 1141, 1151 (2d Cir.1989) (use of charts in complex trials appropriate "so long as the judge properly instructs the jury that it is not to consider the charts as evidence"), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). To the extent that one might characterize such a statement as signifying that the district court may not introduce the chart into evidence, we disagree. Indeed, support for our interpretation of the statement above comes from *Scales* itself in that the Sixth Circuit explicitly upheld the district court's decision in that case to introduce the summary chart into evidence. *Id.* It is also important to note that in looking to the abovementioned decisions and the policy reasons behind Rule 611(a), the concern is not so much with the formal admission as it is with the manner in which the district court instructs the jury to consider the chart. Whether or not the chart is technically admitted into evidence, we are more concerned that the district court ensure the jury is not relying on that chart as "independent" evidence but rather is taking a close look at the evidence upon which that chart is based. *See United States v. Goldberg,* 401 F.2d 644, 647–48 (2d Cir.1968), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790, *and* 394 U.S. 932, 89 S.Ct. 1202, 22 L.Ed.2d 461 (1969) (admission of charts into evidence not abuse of discretion where district court instructed jury that charts were not "independent" evidence and, instead, were only representations of other admitted evidence).[10]

---

**9.** Rule 403 states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**10.** The Second Circuit's decision in *Casamento,* 887 F.2d at 1151, provides another example of how a court may state that a summary chart is not to be admitted into evidence, but upon closer examination demonstrates the more fundamental point that the chart may be admitted if the func-

tion of that chart is properly explained to the jury. In stating that the Second Circuit allows the use of summary charts "so long as the judge properly instructs the jury that it is not to consider the charts as evidence," the *Casamento* court cited to two cases: (1) *Goldberg,* 401 F.2d at 647–48; and (2) *United States v. Baccollo,* 725 F.2d 170, 173 (2d Cir.1983). As alluded to in the citation to *Goldberg* in the text, the Second Circuit was careful to note that it was upholding the district court's decision to admit the summary chart into evidence and under what circumstances such admission was proper:

In this case, applying the principles discussed above, we find that the district court did not err in admitting the summary chart. First, it is likely that the summary chart served to aid the jury in ascertaining the truth. The record reflects that in presenting its case-in-chief over a seven-day period, the Government called over thirty witnesses who testified about the workings of the alleged drug conspiracy. Of these thirty witnesses, twenty-eight were co-conspirators or had direct dealings with the drug conspiracy. In light of the complex nature of the extended drug conspiracy and the large number of witnesses presented, we conclude that the summary chart likely helped the jury in sifting through the testimony in the case.

Second, we find that the district court appropriately employed the safeguards discussed above to minimize any potential prejudice to Appellants. To begin, the parties stipulated that the chart accurately reflected the testimony of the prior witnesses, albeit in a light most favorable to the Government. Before taking any testimony as to the chart, the district court allowed Appellants to voir dire Detective Hudson in the presence of the jury as to the circumstances surrounding the creation of the chart and his reliance on the earlier testimony of witnesses in the case. After direct examination of Detective Hudson was completed, the district court also allowed extensive cross-examination regarding his basis for the chart. Before beginning the cross-examination, the Appellants requested, and the district court granted, a recess to allow Appellants adequate time to prepare their cross-examination regarding the chart.

During cross-examination, Appellants asked numerous specific questions about the credibility of the underlying testimony summarized in the chart and were allowed to make marks on the chart where they thought a portion of the chart reflected a credibility issue. In short, the record reflects that the Appellants had ample opportunity—of which they took advantage—to cross-examine Hudson on the composition of the summary chart.

The district court also offered a number of limiting instructions to ensure that possible prejudice to Appellants was minimized. During the cross-examination of Hudson, for example, the district court stressed that the jury must weigh the significance of the underlying testimony when looking at the summary chart:

> Government's Exhibit 19, . . . the chart, is the Government's analysis of the evidence. It is the case as the Government sees it from the evidence which has been adduced here in the courtroom, and, of course, it is subject to such interpretation as you as a jury feel is appropriate to be given to it. In other words, it is presented to show what the Government contends has been proven in the case. That is the contention. It's up to you then as a jury to resolve any issues that may be in your mind concerning [the chart].

(Supp. J.A. 509.) Furthermore, at the end of the trial, the district court charged the jury with the following limiting instruction:

> Government's Exhibit Number 19, that's the chart that was put up, that is simply a summary of what the Government con-

The charts and summaries admitted into evidence were constructed exclusively from the testimony of the government's witnesses and from Biltmore's voluminous business records, which had been previously admitted into evidence. The court carefully charged the jury that these resumes were not themselves independent evidence, but only "visual representations of information or data as set forth in the testimony of a witness or in documents that are exhibits in evidence." The trial judge further pointed out that the charts and summaries were "no better than the books or the testimony upon which they are based, and it is for you to decide whether the charts, schedules or summaries correctly present the data set forth in the testimony and exhibits upon which they are based." We have examined the charts and summaries objected to and find no basis for the claim of prejudice; their admission was well within the trial judge's discretion.

*Goldberg,* 401 F.2d at 647–48. In *Baccollo,* the Second Circuit once again reviewed and upheld the district court's decision to admit a summary chart into evidence, reasoning that "[t]he admissibility of such charts[,] *provided their function is explained to the jury,* . . . has long been recognized." 725 F.2d at 173 (citing *Goldberg,* 401 F.2d at 647–48). In short, a review of these cases indicates that behind the general proposition that summary charts shall not be introduced into evidence is a more subtle reasoning that the charts may be introduced—but only if adequate protections are provided to minimize prejudice to the defendant.

tends that the evidence shows. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case.

(Supp. J.A. 370.) Those instructions clearly informed the jury that the chart represented the Government's analysis, and that the jurors must weigh the evidence and determine the witnesses' credibility on their own. Without evidence to the contrary, we follow the presumption that the jury obeyed the limiting instructions. *See Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987) ("[J]uries are presumed to follow their instructions."); *United States v. Ince,* 21 F.3d 576, 584 (4th Cir.1994) (same).[11]

Accordingly, we conclude that, pursuant to Rule 611(a), the district court did not err in admitting the summary chart, and the foundational testimony for that chart, into evidence.

### B.

■ We turn next to the general testimony that Detective Hudson offered, separate from that relating to the summary chart. There is little question that certain portions of Hudson's testimony, such as his explanation of various drug-related slang, were admissible under Rule 702. In fact, there are extended portions of Hudson's testimony to which Appellants did not object. Yet, the Government's direct examination of Hudson often produced extended testimony that was simply a summary of prior testimony as to particular events and persons. In these instances, Hudson failed to state an opinion reflecting any "specialized knowledge" as required under Rule 702. *See, e.g., Baker,* 10 F.3d at 1411–12.

Detective Hudson's testimony concerning the approximate weight of crack cocaine allegedly received by Appellant Lewis from various co-conspirators exemplifies this tendency to offer summary testimony. Detective Hudson testified that he was able to calculate minimum and maximum amounts of cocaine each Appellant had possessed by adding up the amounts to which the various witnesses had testified. After overruling objections that the testimony was simply summary in nature, the district court permitted Detective Hudson to testify in the following manner as to Appellant Lewis:

Q: Now, I'd like to draw your attention to the third area of analysis that you described and that would be cocaine, crack cocaine, actually distributed, as indicated by the evidence before this court. Have you also reviewed that evidence?

A: Yes, sir, I have.

Q: Would you summarize that [evidence] for the jury[?]

A: Based on the testimony of the witnesses, crack cocaine that they received from Steve Lewis totaled a minimum of 251 ounces or 6.97 kilograms and a maximum of 555 ounces or 15.42 kilograms that was distributed by Steve Lewis to his respective subdistributors for sale.

\* \* \* \* \* \*

Q: Can you articulate or summarize for the jury the testimony of the witnesses that gave rise to that total[?]

A: Yes, sir. Again, the witnesses had difficulty remembering exactly how much crack that they had received from Mr. Lewis. So there were ranges given in their testimony. Kent Johnson's evidence was he received between twenty and thirty ounces. Earl Jackson testified that he received fifteen ounces. Adrian Owens received two ounces. Alfred Wood testified that he received a minimum of 36 and a maximum of 120 ounces.

---

11. Appellants also challenge the district court's decision to allow the summary chart to go back with the jury during deliberations. We agree with those courts that have ruled in this context that given the proper admission of the summary chart into evidence, it is not error to send the chart to the jury during deliberations. *See, e.g., Pinto,* 850 F.2d at 935; *Scales,* 594 F.2d at 564 n. 3 ("In most cases, however, once the summary is considered properly admitted, the issue of its going to the jury is not separately raised.... For essentially the same reasons we rule that this exhibit was properly admitted, we conclude that no right of appellant was prejudiced by its submission to the jury.").

John Allen testified he received four ounces. Sharon Chapman's evidence was that she received a minimum of 72 ounces and a maximum of 240 ounces. Austin Lopez Douglas testified that he received a minimum of 72 ounces and a maximum of 112. James Porter testified that he received three ounces of crack from Steve Lewis. James Hollins testified that he received two ounces of crack from Steve Lewis.

Walter Robinson testified that he received about twenty ounces of crack from Steve Lewis, and Kenneth Lewis testified that he received a minimum of five ounces and a maximum of seven ounces directly from Steve Lewis.

(J.A. 1041–42.) Although Detective Hudson's testimony adding the various weights (while attempting to avoid double counting previous witnesses' figures) was likely helpful to the jury as a summary of the witnesses' recollections, the adding of the figures did not require any specialized knowledge as required under Rule 702. *See Baker*, 10 F.3d at 1411–12 (Government agent "calculated the value of ... narcotics involved using figures derived from the evidence presented at trial. Presumably the only thing that rendered [the government agent] more capable than the jury to perform this function was that she was permitted to take notes. [The government agent's] simple arithmetical calculations were not an appropriate subject for expert testimony under Rule 702.").[12]

However, we conclude that, as with the summary chart, the district court did not err in admitting the summary testimony into evidence pursuant to Rule 611(a) of the Federal Rules of Evidence. We agree with a number of circuit courts that have relied upon Rule 611(a) as the means for reviewing whether a district court has properly admitted such summary testimony into evidence. *Baker*, 10 F.3d at 1412; *Paulino*, 935 F.2d at 753. First, for the same reasons in the discussion of the organizational chart, (e.g., the com-

plexity of the conspiracy and number of witnesses), Hudson's summary testimony likely aided the jury in ascertaining the truth. Second, as with the summary chart, the district court allowed extensive cross-examination concerning the validity of Hudson's summary testimony. For these reasons, we cannot conclude that the district court abused its discretion in admitting the summary testimony.

## C.

■ We stress that in the ordinary federal drug prosecution, neither a summary witness's testimony nor a summary chart of the sort discussed here would be admissible pursuant to Rules 702 or 611(a). In such cases, the use of summaries—be it through narrative or charts—is best saved for the prosecutor's closing argument. The dangers inherent in using a summary witness in a federal criminal prosecution to support the government's case-in-chief are plain and are only exacerbated in circumstances such as are present in this case where the witness was also testifying in the role of an expert. The dual role of expert and summary witness often lends to the credibility of earlier government witnesses and adds to any possible confusion that the jury might face in attempting to weigh the evidence presented. However, due to the large number of witnesses and extensive evidence, as well as the curative instructions offered by the district court, we conclude that the district court acted within its discretion in admitting the summary testimony and summary chart in this matter.

## IV.

■ Appellants jointly argue in a *pro se* supplemental brief that their CCE convictions should be vacated because they may not be convicted of both a conspiracy under § 846 and a CCE under § 848. We agree that these convictions cannot coexist. However, we follow circuit precedent in remanding the case to the district court to vacate the

---

**12.** Fed.R.Evid. 1006 does not provide a basis for the ability of the summary testimony as the plain language of the Rule does not encompass the

summary of oral testimony at trial. *Baker*, 10 F.3d at 1411.

conspiracy conviction, not the CCE conviction.

"A defendant convicted under § 848 may not also be convicted for any predicate conspiracy charges proved as elements of the § 848 offense. 'Congress did not intend that an individual be punished under both [§ 846 and § 848].'" *United States v. Butler*, 885 F.2d 195, 202 (4th Cir.1989) (quoting *United States v. Porter*, 821 F.2d 968, 978 (4th Cir. 1987), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988)). Recently, in *United States v. McManus*, 23 F.3d 878, 884 (4th Cir.1994), the defendant was convicted of both conspiracy and CCE, and this court remanded the § 846 conspiracy conviction to the district court for vacatur because "the indictment had expressly referenced the conspiracy charges as predicate offenses for the § 848 violation."

Here, Appellants were indicted and convicted of engaging in a § 846 conspiracy and conducting a CCE in violation of § 848. The underlying criminal activity used to support the CCE charge included Appellants' violations of § 841 and § 846. At trial, the same evidence and events were used to support both the conspiracy and the CCE convictions, and the conspiracy and CCE were alleged to have occurred during the same time frame, from summer 1988 to March 1, 1991. Accordingly, we remand this action to the district court with instructions to vacate Appellants' convictions under § 846 for conspiracy to distribute cocaine and their resulting sentences on that count. That vacatur will not otherwise affect their concurrently-imposed life imprisonment sentences for the CCE convictions.

## V.

Our review of the several other constitutional and procedural errors alleged by Appellants reveals no reversible error.

### A.

■■■ Appellants first argue that the district court erroneously rejected their challenge under *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). *Batson* precludes a prosecutor from challenging potential jurors solely on the basis of race. We may reverse a district court's rejection of a *Batson* challenge only for clear error. *United States v. Campbell*, 980 F.2d 245, 249 (4th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 2446, 124 L.Ed.2d 663 (1993).

In this case, Lewis is African–American and the prosecutor used peremptory strikes to eliminate the last two African–Americans from the jury venire. The district court determined that Lewis had made a *prima facie* showing of discrimination, thereby requiring the Government to show racially neutral reasons for the strike. *See Campbell*, 980 F.2d at 248–49. The Government explained that it used one peremptory strike because the potential juror's husband had been involved in criminal activity, and it used the other strike because the potential alternate juror knew two possible Government witnesses. These reasons "were not intrinsically suspect, were adequately supported by observable fact and were therefore properly determined by the [district] court to be race-neutral." *Banks*, 10 F.3d at 1049; *see also United States v. Bennett*, 928 F.2d 1548, 1552 (11th Cir.1991) (upholding striking a juror because of his close relationship with a convicted criminal); *United States v. Hendrieth*, 922 F.2d 748, 749–50 (11th Cir.1991) (upholding striking a juror because she knew and was related to a defense witness). We find no clear error in the district court's acceptance of these reasons as racially neutral.

### B.

■■■ Appellants also argue that 21 U.S.C. §§ 841, 846, and 848 establish a racially discriminatory penalty ratio of 100:1 for the distribution of crack cocaine versus powder cocaine. We find this claim to be meritless. *See United States v. Thomas*, 900 F.2d 37, 39–40 (4th Cir.1990) ("Congress could rationally have concluded that distribution of cocaine base is a greater menace to society than distribution of cocaine powder and warranted greater penalties because it is less expensive and, therefore, more accessible, [and] because it is considered more addictive....").

### C.

██ Appellants next contend that a sentence of life imprisonment for the CCE convictions violates the Eighth Amendment's prohibition against cruel and unusual punishment. We find this claim to be without merit. *See Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (indicating that a mandatory life sentence is not unconstitutionally disproportionate to a first-time drug offense).

### D.

██ Finally, Appellants argue that the prosecution committed at least five violations of the rule, under Fed.R.Crim.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requiring the prosecution to satisfy a defendant's discovery requests. The information which was allegedly withheld was ultimately disclosed, and none of the alleged violations affected the outcome of the case. *See United States v. Bagley,* 473 U.S. 667, 674–75, 677, 105 S.Ct. 3375, 3379–80, 3381, 87 L.Ed.2d 481 (1985) (evidence must be material and likely to have changed the verdict). Hence, this claim is similarly without merit.

### VI.

For the foregoing reasons, we reject Appellants' challenges and affirm their convictions and sentences. However, we remand the case with instructions to the district court to vacate Appellants' conspiracy convictions.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*

PAYNE, District Judge, concurring:

I join the majority opinion except Part III which addresses the appellants' challenge to the admission of: (1) Exhibit 19, a chart prepared by Detective Hudson to depict the organization of the conspiracy; and (2) Hudson's summary of the testimony of preceding government witnesses. Detective Hudson was the DEA case agent who led the investigation that produced this prosecution. Much of Hudson's testimony was properly admitted after he was qualified as an expert in the

packaging, pricing, use and distribution of narcotics. In fact, there was no objection to his testimony on those subjects. There was, however, objection to Hudson's summary of the testimony of other witnesses, most of whom were convicted or unindicted co-conspirators, and to Exhibit 19 which reflected Hudson's interpretation of that testimony, admittedly filtered through his judgment on the credibility of the witnesses who gave it.

Part III A of the majority opinion accurately describes Exhibit 19, the foundational testimony offered to support it, the procedure by which it was admitted into evidence, and the limiting instructions given respecting its genesis and effect. In Part III B, the majority opinion recounts an example of Hudson's testimonial summary which, as the majority correctly notes, was extensive. Two other examples are useful background.

Q: Detective Hudson, will you please relate to the jury *from Detective Berry's testimony* what it was that Steve Lewis indicated about crack cocaine?

A: That specific conversation dealt with prices of different quantities of cocaine, kilograms of cocaine that were selling for $23,000, which is a very fair price.

(JA 974) (emphasis added). Hudson went on to state:

*Mr. Lewis told Detective Berry* that the next man could sell it for $1,400, which is an accurate representation of what on the street that would go for. So everybody was making about $200 an ounce.

(JA 975) (emphasis added). The objection lodged by counsel for Johnson was overruled, and Hudson was allowed to state his understanding of Berry's testimony and then to comment upon the validity of the underlying statement attributed to Lewis by Berry.

A few questions later the prosecution asked Hudson:

Q: *Could you relate in summary fashion what Detective Berry's testimony was* and then explain to the jury *whether or not that is consistent with your experience* as a narcotics investigator.

(JA. 976) (emphasis added). In response, Hudson summarized what he understood Berry to have said about Lewis' pretrial statements to Berry, and then was asked:

Q: Again, is that or is that not consistent with your experience?

A: Yes, sir, that's consistent with my experience.

(JA 977).[1]

At trial, the proffered justification for this testimony and Exhibit 19 apparently was Hudson's expertise. On appeal, the prosecution argues that Exhibit 19 and its foundational testimony are admissible under FRE 1006 which permits admission of summaries of voluminous documents. The majority opinion holds that Hudson's testimony was not admissible as expert opinion under FRE 702 and that Exhibit 19 was not admissible under FRE 1006. I concur in those holdings and in the rationale on which they are based.

I also agree with the majority opinion's fundamental premise that FRE 611(a)(1) affords a basis for permitting summary charts to be used at trial. I depart, however, from the majority's view that FRE 611(a)(1) permits the receipt of such charts into evidence and allows one witness to summarize the testimony of others, as Hudson did here.

A. *The Summary Chart—Exhibit 19*

As the majority opinion explains, there is an irreconcilable conflict in the line of authority which applies FRE 611(a)(1) to charts such as Exhibit 19. The conflict occurs because many appellate decisions require the jury to be instructed that such a chart is not evidence and, at the same time, purport to sustain the trial court's decision to "admit" the chart or to permit the jury to have it in the jury room during deliberations. This phenomenon is reasonably demonstrated in *United States v. Scales*, 594 F.2d 558 (6th

Cir.), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979), wherein the Sixth Circuit reviewed a set of summary charts which, *inter alia*, summarized the Government's proof count by count in a multi-count indictment. The following oft-cited passage from *Scales* is instructive:

Entirely aside from Rule 1006, there would still be ample authority for the admission of Exhibit 145 into evidence. There is an established tradition, both within this circuit and in other circuits, that *permits a summary of evidence to be put before the jury with proper limiting instructions.* (emphasis added) [citations omitted]. These cases normally involve violations of income tax laws but there has never been any formal distinction between the use of summaries in that type of case and in other types of criminal cases. [citations omitted].

\* \* \* \* \* \*

The purpose of the summaries in these cases is simply *to aid the jury in its examination of the evidence already admitted.* (emphasis added) [citation omitted]. Authority for such summaries is not usually cited, but would certainly exist under Fed.R.Evid. 611(a). *See Weinstein's Evidence* ¶ 1006[03].

The danger of permitting presentation of a summary of some of the evidence in a criminal case is plain. The jury might rely upon the alleged facts in the summary as if these facts had already been proved, [citations omitted] or as a substitute for assessing the credibility of witnesses. [citations omitted]. *This danger has led to the requirement of "guarding instructions" to the effect that the chart is not itself evidence but is only an aid in evaluating the*

1. Neither Johnson nor Lewis lodged specific objections to that series of questions, but both defendants previously had objected to the same kind of questions. The record shows that the District Court and the parties understood that previous objections had been preserved with a standing objection.

Mr. Lawrence: May I, Your Honor, state so I don't have to get up every time, we object to this witness being permitted to rehash the evidence. May I have a *standing objection* to that and not waive it by not—

The Court: In fact, *you had it* since we had a conference in chambers on this very issue *yesterday.*

Mr. Lawrence: Yes, sir.

The Court: You have it.

(JA 988) (emphasis added). Counsel for Lewis was also acknowledged to have made the same standing objection. *Id.*

*evidence.* (emphasis added) [Citations omitted].

* * * * * *

Despite the danger, however, most summaries are routinely admitted.

*Id.* at 563–64. Having concluded that the jury must be told that the exhibit was not evidence, the Sixth Circuit then inexplicably added that: "[f]or essentially the same reasons we rule that the exhibit was properly *admitted,* we conclude that no right of appellant was prejudiced by its submission to the jury." *Id.* at 564, n. 3 (emphasis added).

Clearly, there is a conflict between: (i) the text of the decision wherein the court permitted "a summary of the evidence to be put before the jury" with the limiting instruction that it was not evidence; and (ii) the footnote wherein the court observed that the chart had been properly "admitted" and approved its use by the jury during deliberations. Consequently, as the majority opinion observes, *Scales* has been cited as requiring an instruction that a summary chart is not evidence and as authority for "admitting" such charts.

The evolution of the rule in the Second Circuit further illustrates the point. In *United States v. Goldberg,* 401 F.2d 644 (2d Cir.1968), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969), the Second Circuit sustained the "admission" of summary charts, *id.* at 648, upon the instruction that they "were not themselves independent evidence, but 'only visual representations of information or data as set forth in the testimony of a witness or in documents that are exhibits in evidence.'" *Id.* at 647. Then, in *United States v. Baccollo,* 725 F.2d 170 (2d Cir.1983), the court, citing *Goldberg,* sustained the decision of the district court permitting "the prosecution to introduce *as evidence* charts on which there was represented primary evidence...." *Id.* at 173 (emphasis added). Five years later, the Second Circuit, citing *Goldberg, Baccollo* and *Scales,* summarily sustained admission of summary charts and their use in jury deliberations without referring to the absence of an instruction that the charts were not evidence. *United States v. Pinto,* 850 F.2d 927 (2d Cir.), *cert. denied, Vence v. United States,*

488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988). The court, however, observed: "With due regard for the possibility that the jury would accept such summaries as documentary fact, the trial court repeatedly reminded the jurors of their responsibility to determine whether the charts accurately reflected the evidence presented." *Id.* at 935.

The following year, in *United States v. Casamento,* 887 F.2d 1141 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), the Second Circuit, without analyzing the apparent differences between *Goldberg, Baccollo* and *Pinto,* applied those decisions to require, as the condition to permitting the *use* of a summary chart, the instruction that the chart was not evidence holding that:

> This court has long approved the *use* of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, [citing *Pinto* ] *so long as the judge properly instructs the jury that it is not to consider the charts as evidence.* [citing *Baccollo* and *Goldberg* ]. Here, the judge gave the jury the *required instruction* . We conclude that the court's rulings permitting the jury's *use* of the government's summary charts was not improper.

*Id.* at 1151 (emphasis added).

The majority opinion here wisely declines to perpetuate the ambiguity reflected in the decisions of the Sixth and Second Circuits. Instead, the majority adopts the view that summary charts are admissible in evidence and, in so doing, eliminates the need for an instruction to the contrary so long as the district court properly explains the limitations on the use to which the chart may be put.

This, I respectfully submit, misperceives the nature of a summary chart which is only a vehicle by which evidence may be presented, not evidence in its own right. This vehicle may be used upon a finding that its use will "make the interrogation [of witnesses] and presentation [of evidence] effective for the ascertainment of truth." However, the fact that the vehicle for presenting evidence may be used does not convert it into evi-

dence. For that reason and to avoid the possibility of prejudice adequately explained in *Scales,* it is important to tell the jury that the vehicle is not evidence and to circumscribe its use with instructions that require the jury to focus, not on the summary chart, but on the underlying evidence. Accordingly, as in *Casamento,* I would interpret FRE 611(a)(1) to permit the *use* of a summary chart and to require an instruction that it is not evidence and instructions that circumscribe its use. If those instructions are given, it is within the discretion of the district court to permit the jury to have the chart during deliberations.

Here, the District Court's instructions explaining the limits on the use of Exhibit 19 were more than adequate. However, under the rule, as I understand it, Exhibit 19 should not have been admitted into evidence.

### B. *Hudson's Testimony Summarizing The Testimony Of Other Witnesses*

The majority opinion relies upon *United States v. Baker,* 10 F.3d 1374, 1412 (9th Cir.1993), and *United States v. Paulino,* 935 F.2d 739, 753 (6th Cir.1991), to sustain the admission of Hudson's summary testimony under FRE 611(a)(1). *Baker* and *Paulino* both hold that it is within the district court's discretion under the rule to allow such testimonial summaries. Neither decision, however, considers the impact of FRE 602 (personal knowledge requirement), FRE 611(a)(2) (needless consumption of time) or FRE 403 (needless presentation of cumulative evidence).

Nor does either decision adequately address the prejudice—probative value balance required by FRE 403. *Baker* nodded in that direction by sanctioning a foundational hearing outside the presence of the jury and by permitting a one week mid-trial continuance. *Paulino* brushed it aside by finding that adequate cross-examination had alleviated " 'any danger of inaccuracy or unfair characterization.' " *Id.* at 753.

Wholly apart from the fact that solutions such as this constitute the "needless consumption of time" to allow the "needless presentation of cumulative evidence," they do not satisfy the prejudice—probativity analy-

sis required by FRE 403. This is because the prejudice from a testimonial summary comes from the inherent confusion that occurs during such a summary and from the inability effectively to cross-examine one witness about what another witness has said. Hence, the real prejudice is not alleviated by allowing extra time to prepare for cross-examination of the summarizing witness, as in *Baker,* or by permitting wide-ranging cross-examination, as in *Paulino.* In fact, solutions such as this tend to exacerbate the prejudice, rather than to minimize it because the focus becomes the accuracy of the summary rather than the reliability of the underlying testimony. The prejudice is further compounded when the summarizing witness is the prosecuting case agent whose summary is structured around his own credibility judgments.

Nor can evidence of this sort pass muster under the probative value component of FRE 403 because no significant probative value can be ascribed to a summary by one witness of the testimony given by other witnesses. As a result, a summary of that sort likely can never, and did not here, satisfy the balance required under FRE 403. That is especially true where, as here, the testimony that Hudson summarized came almost exclusively from convicted and unindicted co-conspirators and Hudson's summary did not reflect the impeachment component of the co-conspirators testimony.

For the foregoing reasons, I am unable to construe FRE 611(a)(1) to permit the admission of Hudson's testimonial summary.

### C. *The Harmless Error Analysis*

The error in admitting Exhibit 19 and Hudson's testimonial summary was not constitutional in scope and was properly preserved by timely objection at trial. It, therefore, is necessary to assess whether the error was harmless. *United States v. Ince,* 21 F.3d 576, 582 (4th Cir.1994).

Fed.R.Crim.P. 52(a) provides that "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Ordinarily, an error that affects substantial rights must have been prej-

udicial at trial in the sense that it must have affected the outcome of the district court proceedings. *United States v. Olano,——* U.S. ——, ——, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993). Under *Olano,* it is incumbent upon appellate courts to determine whether the error is prejudicial and, in that regard, "... Rule 52(a) saddles the Government with the burden of showing that the claimed error had no prejudicial impact on the jury's deliberations." *Ince,* 21 F.3d at 582.

The task on appeal, therefore, is to determine whether the judgment of the jury was substantially swayed by the error. To that end, the appellate court must determine "whether we believe it 'highly probable that the error did not affect the judgment.'" *Id.* at 583 (citations omitted). Three factors guide the inquiry on appeal: "... (1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case." (citations omitted). *Id.*

### 1. *Centrality*

The principal issues at trial were the extent to which, if any, and in what ways, if at all, Lewis and Johnson were involved in the very substantial conspiracy to which some 30 witnesses testified. Hudson's testimonial summary and Exhibit 19 are directed to those core questions and, accordingly, the error relates to central issues at trial.

### 2. *Mitigation*

As the majority opinion points out, the District Court took a number of steps which can be considered as mitigation. First, it issued an instruction immediately after qualifying Hudson as an expert informing the jury that "... you are to accept it [Hudson's opinions] just as you would accept any other evidence...." (JA 967–68). Second, the District Court provided a limiting instruction during the cross-examination of Hudson about Exhibit 19 in which the jury was told that the chart was intended to show things the way the government contends the proof to have been and that the jury was to resolve "any issues that may be in your mind concerning [the chart]." (Supp. JA 509). Finally, as part of the final charge, the District

Court again focused on Exhibit 19 informing the jury that the exhibit was "... simply a summary of what the Government intends that the evidence shows. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case." (Supp. JA 370).

These measures, on their face and in context, would appear to have mitigated the effects of the error. However, that view of these measures is undercut by the importance which the prosecution ascribes to the evidence in claiming on appeal that it was "essential for the jury to hear" Hudson's summary of the evidence as reflected in the chart. (Brief of Appellee, p. 38). The issue of mitigation is further complicated by the facts that: (1) as is often true in drug conspiracy cases, the prosecution's case depended largely on evidence offered by witnesses who were subject to substantial credibility attack; and (2) the challenged evidence, by its nature, had the tendency to undercut the defendants' principal line of defense: attacking the credibility of the prosecution's witnesses. However, at least in the context of this case, it is not possible to divorce the mitigation factor from consideration of the final and "'the single most important factor' in a nonconstitutional harmless-error inquiry: whether the case was 'close.'" *United States v. Ince,* 21 F.3d at 584.

### 3. *Closeness*

In assessing the closeness of the case, an appellate court necessarily engages in

> ... a highly judgmental process, involving much more of feel than of science.
>
> * * * * * *
>
> The inquiry into "closeness" instead involves assessing whether the other evidence is not only sufficient to convict, but whether it is sufficiently powerful in relation to the tainted evidence to give "fair assurance" that the tainted evidence did not substantially sway "the jury."

*Id.* The record establishes that there was an abundance of evidence upon which to sustain the convictions of Lewis and Johnson and to support the quantity findings necessary to affirmation of the sentences.

Numerous witnesses, including persons with first-hand knowledge because they func-

tioned above, alongside and below Lewis and Johnson, clearly established that there was a conspiracy and that, by word and deed, Johnson and Lewis joined it, actively furthered its objectives and significantly directed others in achieving its illicit objectives. Indeed, notwithstanding the prosecution's protestations to the contrary on appeal, neither Hudson's testimonial summary nor Exhibit 19 was in the least "essential;" and, in my view, the prosecution needlessly complicated an otherwise strong case by presenting Hudson, under the guise of an expert, to summarize the evidence in the prosecution's favor to use as a springboard for closing argument.

For the foregoing reasons, the case cannot be considered close because the evidence, as a whole, gives fair assurance that the jury, in perspective of the mitigating measures taken below, was not substantially swayed by the tainted evidence. Thus, on the unique facts of this case, the error was harmless.

Most often, however, a reviewing court will not be presented with a record as compelling as this. In that regard, I share the concerns expressed in Part III C of the majority opinion respecting the inherent dangers in permitting testimony such as that given here by Hudson. However, I also believe that this case is today's ordinary federal drug prosecution, and that these lengthy, multi-witness, multi-defendant drug conspiracy cases present the greatest need to preclude testimonial summaries and exhibits reflecting the view of the evidence advanced by the prosecuting case agent.[2]

Beyond doubt, it is important in such cases that the jury be given help in pulling together the strands of evidence. That help is properly provided in the prosecution's closing argument where, for example, it is entirely appropriate for the prosecution to summarize the testimony of witnesses and to do so with the aid of a chart such as Exhibit 19.

That help, I respectfully submit, cannot come from the prosecuting case agent precisely because of the complex nature of these drug conspiracy cases. For example, they present the very real prospect that the evidence will run together and that one defen-

dant, therefore, will be confused with others. Moreover, it usually is true in these cases that the evidence is stronger against some defendants than others. And, the prosecution witnesses often are subject to impeachment because of previous felony convictions or because they are testifying under a grant of immunity or on the expectation of a reduced sentence.

For these reasons, it is especially important in complex conspiracy cases that members of the jury make for themselves, as to each defendant, the credibility judgments and the connecting evidentiary links necessary for conviction. I respectfully submit that they are not in fact and may not in law be aided in that task by the prosecuting case agent's summary of what has been said by the prosecution's other witnesses or by the admission into evidence of a chart depicting his interpretation of that evidence.

---

2. This, of course, will not preclude the admission into evidence of summaries of voluminous documentary evidence under FRE 1006 or the use, under FRE 611(a)(1), of organizational charts based on proper foundational testimony.