**AMENDED OPINION**

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                     No. 98-4272

PETER ROLLACK,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Chief District Judge.
(CR-96-168)

Argued: December 3, 1998

Decided: March 1, 1999

Amended Opinion Filed: May 2, 2014

Before ERVIN and HAMILTON, Circuit Judges, and HILTON,
Chief United States District Judge for the Eastern District of
Virginia, sitting by designation.

_____

Affirmed by unpublished opinion. Chief Judge Hilton wrote the opin-
ion, in which Judge Ervin and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Christopher Cary Fialko, Charlotte, North Carolina, for
Appellant. Gretchen C.F. Shappert, Assistant United States Attorney,
Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Cal-
loway, United States Attorney, Charlotte, North Carolina, for Appel-
lee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

HILTON, Chief District Judge:

On January 9, 1998 Peter Rollack (a.k.a. "Pistol Pete") was found guilty, by a jury, of conspiracy to possess with intent to distribute a quantity of cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846 (West 1981 & Supp. 1998), and knowingly using and carrying a firearm, and aiding and abetting such conduct, in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) and 2 (West Supp. 1998). Rollack now appeals his convictions. Finding no merit in the seven claims raised on appeal, we affirm.

In the early 1990s, Conspirator 1 [the names of Rollack's co-conspirators and associates have been redacted] became associated with Rollack in the Bronx, New York. Rollack was the leader of a gang known as Sex, Money and Murder ("SMM"), an affiliate of the Bloods. The Bloods is a national gang with affiliates in many cities. SMM was engaged in distributing cocaine and crack cocaine. Conspirator 1 joined this gang. During that same time period, Conspirator 1 was involved in cocaine and crack cocaine distribution in Pittsburgh, Pennsylvania.

Rollack began accompanying Conspirator 1 on the trips to Pittsburgh in late 1993 and 1994. Together, they were transporting eight to ten kilograms of cocaine powder and crack cocaine at a time. Rollack served as a "lookout" on the trips to Pittsburgh and was paid $3,000 to $5,000 per trip.

In 1994, Conspirator 1 and Conspirator 2 (who was named as an unindicted co-conspirator in the indictment against Rollack) met in the Bronx, and Conspirator 2 pitched Conspirator 1 about the potential for distributing drugs in North Carolina. As a result of this conversation, Conspirator 1, Rollack and several of their associates began making trips to North Carolina in a leased Nissan Quest van carrying drugs.

2

On the second trip, Conspirator 1, Rollack and Conspirator 2 met in New York and drove the van, containing six to eight kilograms of cocaine, to North Carolina. During this trip the men sold cocaine in Rockingham and Lumberton, North Carolina, as well as somewhere in South Carolina. They then drove to Charlotte, North Carolina, where Conspirator 1 and Rollack were introduced by Conspirator 2 to Conspirator 3. Conspirator 2, Conspirator 3, Conspirator 1 and Rollack discussed opening crack houses in Charlotte and developing customers for their drug business. During this trip, they also examined several Charlotte neighborhoods as possible locations for their drug business.

After this trip, Conspirator 1, Rollack and Conspirator 2 decided to return to New York temporarily. They left the van at the airport and flew to New York for a few days. At the time, the van contained approximately $70,000 and two kilograms of cocaine. Conspirator 1 then flew down to pick up the van in order to return it to New York.

The third and final trip to North Carolina also began in New York. Conspirator 1, Conspirator 2, Rollack, and a fourth associate left New York in the leased van. The van had Pennsylvania license plates, and contained approximately eight to ten kilograms of cocaine powder and crack cocaine. In Pittsburgh, they collected money and delivered approximately six kilograms of cocaine. The price of each kilogram was between $20,000 and $22,000. A portion of the drugs they distributed in Pittsburgh were Conspirator 1's, while the rest were Rollack's. From Pittsburgh, they drove to Lumberton to collect money on a drug debt, and then to South Carolina to collect more drug money and deliver more drugs. From there, they drove to Rockingham to meet with a customer of theirs, Conspirator 4.

In Rockingham they met with Conspirator 4, who owed them between $80,000 to $90,000 for cocaine he had previously received. However, Conspirator 4 was unable to pay the full amount owed. Rollack was very upset about this development. While tapping a gun against his own head, Rollack told Conspirator 1 and Conspirator 2, "Yo, I'm going in there and murder him." In response to Conspirator 2's pleas, Rollack agreed that Conspirator 4 would have one more day to come up with the remaining money owed. As the four men had plans to drive to Charlotte for the evening, they agreed to meet with Conspirator 4 when they returned the next day.

3

From Rockingham, the four men drove to Charlotte for a concert. They still had two kilograms of cocaine in the van and several firearms for protection. After the concert, they dropped off an associate in Lumberton, drove to Wilmington, North Carolina to deliver more cocaine, and then returned to Rockingham the next day to meet with Conspirator 4.

When they returned to Rockingham on October 21, 1994, Conspirator 2 paged Conspirator 4 in order to make arrangements as to where the men would meet. It was agreed that they'd meet in a local fast food restaurant. However, Conspirator 4 never arrived. Unbeknownst to Rollack, Conspirator 2 had phoned Conspirator 4 and warned him that Rollack intended to murder him. Conspirator 2 then urged Rollack and Conspirator 1 to leave Rockingham, because Conspirator 4 was not likely to arrive and pay his drug debt. Rollack refused: "Ain't nobody going to live in this world who owe me money." Rollack insisted that they drive over to Conspirator 4's house "because I'm going to murder his wife and kids. I ain't playing." While the three men were considering what to do next, law enforcement officers appeared and detained Conspirator 1, Conspirator 2 and Rollack. The officers had been tipped by an informant that drugs were being transported into Richmond County, North Carolina in a burgundy Nissan Quest bearing Pennsylvania license plates and occupied by three individuals. It was this tip which led the officers to detain the three men. The officers then proceeded to search the van.

At the time they were detained, each of the three used an alias. During the initial search of the van, the officers failed to locate the drugs, money and the firearms, which were located within a secret compartment. However, two drug narcotics detection canines were brought to the scene. When the dogs alerted on the van, officers moved the van to another location where a search was conducted pursuant to a search warrant.

Conspirator 1, Conspirator 2 and Rollack were transported to the police station without being placed under arrest. After providing false identification to the authorities, the three were released. They discussed among themselves whether to wait in Rockingham until the van was released or to flee the city because the officers might locate the secret compart-

4

ment which contained the drugs, money and guns. Rollack urged them to stay.

While using a pay phone to notify their associates in New York of their plight, the three were arrested. They were taken to the Sheriff's Department, and eventually placed under high bonds. Rollack's uncle and Conspirator 1's cousin provided bond money, and the three were able to bond out of jail several days later. Conspirator 1 never returned to North Carolina to face his charges, nor did he make any subsequent drug trips to North Carolina.

While Conspirator 2 did not return to face his pending charges as well, he did continue to be involved in drug trafficking in North Carolina in 1995. Conspirator 2 associated himself with Conspirator 5. Conspirator 5 arranged to have crack cocaine transported to North Carolina, and Conspirator 2 then distributed the drugs.

In early 1996, while Conspirator 2 was still dealing with Conspirator 5, Conspirator 2 spoke by phone with Rollack. At the time of the conversation with Rollack, Conspirator 2 owed Conspirator 5 money for a drug debt. During the telephone conversation, Rollack explained that the source of cocaine Conspirator 2 had received from Conspirator 5 was, in fact, Rollack's uncle. Rollack explained that "[m]y uncle gave Conspirator 5 some cocaine to sell for me, so I could pay for my lawyer." Rollack went on to explain that the kilogram and a half of crack cocaine that Conspirator 5 fronted to Conspirator 2 actually belonged to Rollack, and that Rollack wanted his money. Conspirator 2 agreed to reimburse Conspirator 5 for the drug debt and to loan Rollack additional money to pay for his lawyer. Conspirator 2 estimates that he sent Rollack approximately $20,000 during 1995 and 1996.

At Rollack's trial, Conspirator 1 and Conspirator 2 testified, along with others who corroborated their stories. Also called to testify was Special Agent Terry Tadeo of the Bureau of Alcohol, Tobacco and Firearms. Agent Tadeo testified about the interception of Rollack's mail, pursuant to Federal search warrants, between December 17 and December 27, 1997. The mail was seized from Rollack's jail cell. The mail which was seized was written in Bloods code. Also seized was a list

5

of Bloods codes. Agent Tadeo testified that some of the items seized were in Rollack's handwriting, while some were not.

Sergeant Louis Savelli of the New York City Police Department Citywide Anti-Gang Enforcement Unit testified as an expert witness in the field of gang-related codes and as an expert witness on the Bloods gang. Sergeant Savelli examined letters seized from Rollack's cell and testified as to the significance and importance of certain works and symbols. According to Sergeant Savelli, Bloods and other gang members frequently communicate with fellow gang members in code to avoid police detection.

Sergeant Savelli went on to identify Bloods and SMM salutations and expressions in Rollack's correspondence. Agent Tadeo, in turn, summarized the contents of the seized writings and letters from Rollack's jail cell, and related them to the testimony presented by other witnesses at trial. Rollack was subsequently convicted by a jury, and sentenced to 40 years of imprisonment on Count I, and 5 years of imprisonment on Count II, to run consecutively.

Rollack challenges his convictions, claiming: (1) the police did not have probable cause to search the Nissan Quest van immediately upon seizure; (2) the trial court erred by allowing testimony of prior bad acts occurring in times and places distant from the conduct alleged in the indictment; (3) the trial court erred by allowing introduction into evidence of multiple writings, rap songs and letters found in a search of the Defendant's jail cell and mail; (4) the trial court erred by allowing for a constructive amendment of the indictment when it permitted extensive testimony and documentary evidence about the activities of SMM, and about Defendant's role in that gang; (5) the trial court erred by allowing Agent Tadeo to summarize the contents of the writings seized from Defendant's jail cell, and then relate the writings to the testimony of the witnesses at trial; (6) the trial court erred by refusing to give a requested multiple conspiracies' jury instruction; and (7) the trial court erred in applying sentencing enhancements for Rollack's leadership role and for obstruction of justice.

I.

The first issue for this Court is whether the trial court erred in not suppressing the evidence seized from the Nissan Quest. We will

6

review the factual determinations of the lower court under a clearly erroneous standard. See United States v. Kitchens, 114 F.3d 29, 31 (4th Cir. 1997). The legal conclusions of the trial court are to be reviewed de novo. See United States v. Johnson, 114 F.3d 435, 441 (4th Cir. 1997).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois , 439 U.S. 128, 131 n.1 (1978); accord United States v. Ramapuram, 632 F.2d 1149, 1155 (4th Cir. 1980), cert. denied, 450 U.S. 1030 (1981). To establish a violation of one's Fourth Amendment rights, a defendant must first show that he had a "reasonable expectation of privacy" in the place searched. See Rakas, 439 U.S. at 143; United States v. Al-Talib, 55 F.3d 923, 930 (4th Cir. 1995); United States v. Horowitz, 806 F.2d 1222, 1225 (4th Cir. 1986). If a defendant cannot make such a showing, the defendant cannot challenge the reasonableness of the search and seizure. See United States v. Rusher, 966 F.2d 868, 873 (4th Cir.), cert. denied, 506 U.S. 926 (1992).

A reasonable expectation of privacy is not created by the subjective expectation of the proponent alone. See Horowitz , 806 F.2d at 1225. Rather, to have a reasonable expectation of privacy the defendant must show he had control over the area searched; he had taken measures to ensure privacy; and that society is willing to recognize defendant's expectation as reasonable. See id.

Rollack claims that he had a reasonable expectation of privacy in the leased van in that the lease agreement for the van did not preclude him from driving; he had a property interest in the guns, money and drugs found in the van; and that he had secreted the contraband in a hidden compartment in the van. This, Rollack contends, shows a reasonable expectation of privacy in the van sufficient to allow him to challenge its search.

We are not persuaded by this argument. The van was not leased in Rollack's name, nor did the lease explicitly permit Rollack to drive the van. Further, Rollack did not exercise control over the van by driving it. Rather, he was merely a passenger.

7

In United States v. Wellons, 32 F.3d 117 (4th Cir. 1994), cert. denied, 115 S. Ct. 1115 (1995), the defendant was arrested following the discovery of drugs in a rental car which he was driving but for which he was not listed as an authorized driver on the rental agreement. The defendant was pulled over by a West Virginia State Trooper, and the defendant told the Trooper that the vehicle had been rented by another. While the Trooper awaited verification of the rental agreement, he called for a narcotics-sniffing dog to be sent to the scene. The dog alerted the presence of narcotics and a subsequent search revealed cocaine and heroin. There, we rejected the notion that an unauthorized driver of a rental vehicle had a reasonable expectation of privacy in the car he was driving.

In the case before the Court, Rollack's expectation of privacy is even less compelling than that of the defendant in Wellons. In Wellons, the defendant, who had secreted the contraband in luggage in the car, exercised control over the vehicle as the driver when he was stopped for speeding by a State Trooper. According to Conspirator 2's testimony at trial, Rollack never drove the vehicle during their trip, and the vehicle was obtained by Conspirator 1. Therefore, Rollack is in the same position as the defendant in Wellons, except here Rollack never exercised any control over the vehicle. These facts lead this Court to the inevitable conclusion that Rollack never had a reasonable expectation of privacy in the van, hence he cannot object to the search as being illegal.

II.

The next issue before the Court is the admissibility of evidence pursuant to Rule 404(b) of the Federal Rules of Evidence. Our review is limited to determining whether the trial court abused its discretion. See United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996); United States v. Haney, 914 F.2d 602, 607 (4th Cir. 1990).

Rule 404(b) dictates that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). However, Rule 404(b) applies only to limit the admission of other acts extrinsic to the conduct charged in the indictment. See Chin, 83 F.3d at 87-88. Other criminal acts are considered "intrinsic" if they are "inextricably

8

intertwined or both acts are part of a single criminal episode or other acts were necessary preliminaries to the crime charged." See id., at 88 (adopting the standard of United States v. Lambert, 995 F.2d 1006, 1007 (10th Cir. 1993)). In addition, evidence of other crimes or uncharged conduct is not considered "other crimes" for Rule 404(b) purposes if it "arose out of the same ... series of transactions as the charged offense, ... or if it is necessary to complete the story of the crime [on] trial." United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994) (quoting United States v. Towne, 870 F.2d 880, 886 (4th Cir. 1989)).

Rollack contends that other acts or crimes introduced in the trial were not inextricably intertwined with, nor did they arise out of, the same series of transactions as the charged conspiracy. Hence, the other acts or crimes were extrinsic, and subject to the requirements of Rule 404(b).

Rollack goes on to describe the conspiracy as alleged as one which began in the Summer of 1994 between Rollack, Conspirator 1 and Conspirator 2, and which ended upon their arrest in Rockingham on October 22, 1994. Given this definition of the time frame of the conspiracy, Rollack argues that the evidence presented at trial concerning acts in 1993 and early 1994, the evidence pertaining to SMM's affiliation with the Bloods in 1996, and the evidence pertaining to Rollack's ownership of guns and other vehicles with secret compartments are all extrinsic to the charged drug conspiracy.

However, it is well-settled that the time period of a conspiracy is determined by the evidence presented at trial, not the dates alleged in the indictment. See United States v. Jackson, 757 F.2d 1486, 1490 (4th Cir. 1985). Conspirators are presumed to continue as members of a conspiracy absent affirmative evidence of termination of, or with-drawal from, the conspiracy. See United States v. Walker, 796 F.2d 43, 49 (4th Cir. 1986).

The indictment in this case alleged that Rollack was a member of a conspiracy "within the Western District of North Carolina and else-where." Evidence of Rollack's involvement with drug trafficking in the Bronx, Pittsburgh, North Carolina and South Carolina all per-

9

tained to drug distribution by the persons named in the indictment and their associates.

Evidence pertaining to SMM was also relevant to the crimes charged in the indictment, because Rollack was the leader of the gang, and the gang specialized in drug trafficking, including drug trafficking in North Carolina. Testimony by coconspirators about the transport of drugs from New York, through Pittsburgh, was an integral part of the crime alleged and not extrinsic evidence. See generally United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993), cert. denied, 488 U.S. 1005 (1994). Also, there was no evidence that Rollack withdrew from the conspiracy upon his arrest in Rockingham. To the contrary, the evidence presented at trial showed that Rollack continued in the drug trade, demanding payment from Conspirator 2 for the drug debt owed Conspirator 5.

The Court is satisfied that the trial court did not abuse its discretion in determining that this evidence was intrinsic for purposes of Rule 404(b). This evidence was not offered to prove bad character, but rather "to complete the story of the crime [on] trial."

III.

We next turn our attention to the third issue raised on appeal, whether the trial court erred by allowing introduction into evidence of multiple writings, rap songs, and letters found in a search of Rollack's cell. Our standard of review for the admission of coconspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence is abuse of discretion. See United States v. Hassan, 5 F.3d 726, 731 (4th Cir. 1993); see also United States v. Russell, 971 F.2d 1098, 1104 (4th Cir. 1992), cert. denied, 113 S. Ct. 1013 (1993).

Under 21 U.S.C. § 846, the government need only prove an act showing the defendant's initial participation in the conspiracy, United States v. Covos, 872 F.2d 805, 806 (8th Cir. 1989), which is then presumed to continue until its end, or the defendant's withdrawal is affirmatively shown. See United States v. Sheffer, 896 F.2d 842 (4th Cir. 1990). Where the defendant fails to show that he withdrew from a conspiracy, his membership is viewed as continuing for the duration. See United States v. Barsanti, 943 F.2d 428, 437 (4th Cir. 1991);

10

United States v. West, 877 F.2d 281, 289 (4th Cir. 1990); see generally United States v. Girard, 744 F.2d 1170, 1172-73 (5th Cir. 1984) (bid-rigging conspiracy went beyond awarding of contract and lasted until final payment was made); United States v. Helmich, 704 F.2d 547, 549 (11th Cir. 1983) (conspiracy to transfer secret information lasted seventeen years after last act of transfer, until final payment was made); United States v. Mennuti, 679 F.2d 1032, 1035-36 (2d Cir. 1982) (arson conspiracy lasted after fire until the coconspirator received the payoff, which was used to purchase the torched property); United States v. Walker, 653 F.2d 1343, 1348-50 (9th Cir. 1981) (fraudulent contract lasted until conspirators divided profits).

Indeed, "[a]rrest of some coconspirators does not, as a matter of law, terminate a conspiracy." United States v. Grubb, 527 F.2d 1107, 1109 (4th Cir. 1975). Even acts intended to conceal or cover-up the conspiracy may be in furtherance of its aims or goals. See United States v. Potamitis, 739 F.2d 784, 788 (2d Cir. 1984).

At trial, letters seized from Rollack's jail cell were introduced into evidence, and Sergeant Savelli then translated the documents, written in code, for the benefit of the jury. A handwriting analyst determined that all of the letters were written by Rollack except for a letter Rollack received from an associate and a document of which the analyst could not determine who was the author. The Court determined the letters written by Rollack were admissible pursuant to Federal Rule of Evidence 804(b)(3) as "admissions against interest by a party." The Court also allowed the letters which were not written by Rollack to be introduced into evidence, pursuant to Federal Rule of Evidence 801(d)(2)(E), which allows for the introduction of statements by a coconspirator of a party.

Rollack urges that the trial court erred in several ways. Specifically, he says that the court never made clear in its ruling whether its decision that the "ongoing conspiracy headed by [Rollack] while he is in jail" was the same conspiracy charged in the indictment. If the court was referring to another conspiracy when it made its decision, then the evidence would be extrinsic and subject to the dictates of Rule 404(b).

Further, Rollack contends that the court never weighed the admissibility of the evidence pursuant to Federal Rule of Evidence 403,

11

which requires courts to weigh the relevance of evidence against its prejudicial nature. See Fed. R. Evid. 403. This is troubling to Rollack, as he claims the testimony by Sergeant Savelli was prejudicial, especially Savelli's translation that "Peter Rolls" (an alias of Rollack) was "another term for murder."

However, the evidence seized from Rollack's cell corroborated the testimony of other government witnesses about Rollack's role in SMM, and his continued involvement in the conspiracy alleged in the indictment. Contrary to Rollack's contentions, the District Court's voir dire hearing outside of the presence of the jury enabled the judge to weigh the probative value of the evidence versus its prejudicial impact.

Upon review of the material outside of the presence of the jury, the court noted that there were references in the seized materials consistent with the testimony presented at trial. The attorney for the government argued that the materials were statements against interest of a party-opponent, and that the references in the materials were clearly relevant, as they referred to testimony in evidence.

Sergeant Savelli's testimony indicated that the crossing-out of the letter "c" in the seized documents was a common practice among members of the Bloods and that Bloods frequently communicated in codes. This corroborated trial testimony that SMM became a chapter of the Bloods during the time of Rollack's leadership. In the seized materials, the writer refers to himself as "Pistol," which is consistent with trial testimony that the defendant was known as "Pistol Pete." References to "drop top" referred to drugs, and the reference to an associate is consistent with trial testimony about one of the unindicted coconspirators who made trips with Rollack to North Carolina.

The reference equating "Peter Rolls" to "murder" may or may not have been unduly prejudicial, however we need not decide. If a party fails to object to the admission of evidence, it is reviewable by this Court only for plain error. See Chin, 83 F.3d at 87. Further, objections must be stated with specific grounds given to preserve the objection for appeal, or the reviewing court will review the trial court's actions for plain error. See Fed. R. Evid. 103(a)(1). Here, Rollack made only

12

a general objection to a lengthy narrative containing the first reference and no objection at trial to the second reference.

Further, neither passage referring to "Peter Rolls" implicates Rollack as being involved in murders, and both passages corroborate trial testimony that SMM as an organization did engage in murders. We cannot say the district court abused its discretion in allowing the letters not written by Rollack to be entered into evidence, as there is no indication in the record that Rollack affirmatively withdrew from the conspiracy, and the testimony of an associate at trial indicated that he viewed himself as a conspirator of Rollack. Further, we are satisfied that the judge applied Rule 403 to all of the evidence presented to him during the voir dire proceeding, and that it was not plain error for the court to allow testimony about "Peter Rolls."

IV.

Rollack next contends that the trial court improperly broadened the possible bases for conviction beyond those in the indictment by allowing extensive testimony and documentary evidence about the activities of SMM, and Rollack's role in SMM, thereby constructively amending the indictment. We review this issue de novo. See United States v. Marl, 61 F.3d 279, 280 (4th Cir. 1995).

Constructive amendment of an indictment occurs when there is a presentation of evidence and jury instructions both which work to change the elements of the offense charged, resulting in the defendant being convicted of a crime other than that charged in the indictment. See United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991). However, a "variance which does not affect substantial rights shall be disregarded." Fed. R. Crim. P. 52(a); see Berger v. United States, 295 U.S. 78, 92 (1935) ("substantial rights" are not affected by a variance when the defendant is sufficiently informed of the charges against him so that he can prepare a defense and not be surprised, and when the charge is sufficiently specific to protect him from subsequent prosecution for the same offense); United States v. Odom, 736 F.2d 104, 118 (4th Cir. 1984) (a variance between the indictment and the evidence that does not modify the elements of a crime charged does not invalidate a conviction unless it prejudices the defendant); United

13

States v. DeBrouse, 652 F.2d 383, 389 (4th Cir. 1981) (defendant must demonstrate substantial prejudice on the record as a whole).

Rollack contends that the introduction of evidence at trial of gang communications, drug trafficking and gun possession all occurring in New York impermissibly broadened the possible bases for conviction beyond those presented to the grand jury, resulting in a constructive amendment of the indictment. Rollack objected to the government's introduction of this evidence in limine. In any case, Rollack argues, constructive amendment of the indictment constitutes error per se, and it is conclusively presumed that the defendant has been prejudiced. See United States v. Floresca, 38 F.3d 706, 711 (4th Cir. 1994).

However, Rollack's reliance on Floresca is misplaced. Floresca involved the district court's misinstruction to the jury, which broadened the possible bases for conviction beyond those presented to the grand jury, thus constructively amending the indictment. Rollack does not contend, nor is there any suggestion in the record, that the district court misinstructed the jury in the case before this Court.

We believe that the testimony about SMM, drug trafficking and gun possession is relevant to the alleged drug conspiracy, and is not unduly prejudicial. Indeed, "[t]he jury is entitled to know the setting of the case." United States v. Dudley, 941 F.2d 260, 262 (4th Cir. 1991):

> One of the accepted bases for the admissibility of other crimes arises when such evidence furnishes part of the context of the crime or is necessary to a full presentation of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its environment that proof is appropriate in order to complete the story of the crime on trial by proving the immediate context or res gestae, or the uncharged offense is so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other ... and [is thus] part of the res gestae of the crime charged.

14

Id.; accord Chin, 83 F.3d at 87-88; Kennedy, 32 F.3d at 885.

While Rollack contends that improper jury instructions leading to a constructive amendment constitutes prejudice, nowhere does he claim that the court misinstructed the jury. Since such a claim is a necessary prerequisite to prove constructive amendment of an indictment, see Schnabel, 939 F.2d at 203, his claim of error fails, and the Court is satisfied upon de novo review that the evidence which Rollack objects to is part of the res gestae of the crime charged.

V.

Rollack next contends that the district court erred by allowing Special Agent Tadeo to summarize the contents of the writings seized from Rollack's jail cell, and then relate the writings to the testimony of witnesses called at trial. We review to ensure that the decision to allow the admission of this evidence was not arbitrary or irrational. See United States v. Johnson, 54 F.3d 1150, 1156 (4th Cir.), cert. denied, 116 S.Ct. 266 (1995) (citing United States v. Bailey, 990 F.2d 119, 122 (4th Cir. 1993)); United States v. Loayza, 107 F.3d 257, 264 (4th Cir. 1997).

In an "ordinary federal drug prosecution, neither a summary witness's testimony nor a summary chart ... [will] be admissible pursuant to Rules 702 or 611(a) [of the Federal Rules of Evidence]," because such testimony is inherently dangerous in that it lends credibility to prior government witnesses and is likely to confuse the jury. Johnson, 54 F.3d at 1162. However, Rule 611(a) can be used as a basis for the admission of summary testimony when the testimony aids in ascertaining the truth. Id., at 1159. "The complexity and length of the case as well as the numbers of witnesses and exhibits are considered in making [this] determination." Loayza , 107 F.3d at 264. Also, in making this determination the court must consider the prejudice which would result to the defendant by allowing the summary testimony. Johnson, 54 F.3d at 1159. However, any "[p]rejudice may be dispelled by allowing the defendant an opportunity to cross-examine the individual [presenting the summary testimony]," Loayza, 107 F.3d at 264, and by "ensuring that the district court properly instruct[s] the jury concerning the manner in which they [are] to consider the [summary testimony]." Johnson, 54 F.3d at 1159.

15

At the conclusion of the government's case-in-chief, the prosecutor called Agent Tadeo to testify and summarize the contents of the seized writings and letters from Rollack's jail cell, and to relate them to the testimony presented at trial. Agent Tadeo presented his summary testimony after Sergeant Savelli translated the contents of the writings from Bloods code into English, for the benefit of the jury.

Rollack contends that this was impermissible because his case is distinguishable from Johnson and Loayza on the basis of complexity. In Johnson, Rollack argues, this Court allowed the use of a summary chart due to the complexity of that case, where 45 witnesses testified over a two and one-half week drug conspiracy trial. Id. at 1153. In Loayza, this Court permitted the use of summary charts in a complex Ponzie scheme case which included 13 government witnesses and 130 government exhibits. Loayza, 107 F.3d at 264.

Rollack argues that his case is not complex because at trial testimony was presented by only five cooperating government witnesses; three Rockingham police officers, who testified mainly about chain-of-custody issues; and Agent Tadeo and Sergeant Savelli. Further, the time frame of the conduct alleged in the conspiracy was only ten months. Last, Rollack also argues that the limited usefulness of summary testimony in his case is outweighed by the danger of prejudice to Rollack.

The flaw in Rollack's argument is that he defines whether a case is complex by the number of witnesses called. According to this argument, if there were only a few witnesses, the case must not have been complex. However, our prior cases make clear that when determining whether or not to allow summary testimony, courts are to consider the complexity of the case, the length of the case and the number of witnesses called. Id. at 264; Johnson, 107 F.3d at 1160. Courts are not to use the witness lists as a proxy for complexity. Complexity is a separate determination.

In the instant case, the government correctly points out that this was not a typical drug conspiracy in that material and relevant evidence of the conspiracy included cryptic letters and codes seized from Rollack's jail cell. Such documents were not immediately self- explanatory, and their content and context were not self-evident.

16

Also, while Rollack may claim that the time frame of the conduct alleged in the conspiracy was only ten months, this Court has already determined that various acts performed over a series of years ranging from 1993 to 1996 were intrinsic for purposes of proving the conspiracy. This fact makes it more likely that the summary testimony served to aid the jury in ascertaining the truth.

Further, the district court weighed the danger of prejudice to Rollack, and dispelled this prejudice by allowing Rollack to cross-examine Agent Tadeo, and through giving proper limiting instructions. The district court made clear how the jury was to consider the evidence when it said:

> "Members of the jury, Agent Tadeo has been permitted to testify to summarize certain aspects of these exhibits. A summary is not evidence. The evidence is the exhibits and the translation from Officer Savelli. Those are the evidence, and that's what you should consider. [Officer Tadeo] has been permitted to summarize the exhibits as to those portions that are, or some of which the Government contends are connected to the conspiracy that's the subject of this case, and you will receive further instructions limiting your consideration of these exhibits as the final instructions are given."

Given the complex nature of the evidence presented, the multi-year time frame of the acts which made up the conspiracy, and the limiting instructions of the district court, we cannot say the district court acted in an arbitrary or irrational fashion in allowing the admission of the summary testimony.

VI.

Rollack's sixth ground for appeal is his contention that the district court erred by refusing to give a requested single versus multiple conspiracies' charge. Failure to give a jury charge requested by the defendant constitutes reversible error where the trial court's refusal was clearly erroneous. See United States v. Mills , 995 F.2d 480, 485 (4th Cir. 1993).

17

Rollack contends that the court should have given his instruction concerning single versus multiple conspiracies because the court never made a specific finding that there was but one conspiracy proved by the evidence. It is Rollack's argument that at trial evidence unrelated to the conspiracy in Count I of the indictment was introduced that could have been construed by the jury to be evidence of entirely separate conspiracies. Rollack points to the testimony of Conspirator 1, where Conspirator 1 testified about matters occurring before Conspirator 1 and Conspirator 2 decided to broker drug deals in North Carolina. Rollack also points to the documentary evidence obtained from the search of his jail cell, more than two years after Rollack, Conspirator 1 and Conspirator 2 were arrested in Rockingham.

Evidence that a conspiracy pre-dated and post-dated the dates alleged in the indictment does not create an inference that more than one conspiracy may have existed. See generally Potamitis, 739 F.2d at 787-88; United States v. Del Purgatoria, 411 F.2d 84, 86-87 (2d Cir. 1969). "A single conspiracy exists where there is `one overall agreement,' United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988) (quoting United States v. Bloch, 696 F.2d 1213, 1215 (9th Cir. 1982), or `one general business venture.'" Id. (quoting United States v. McGrath, 613 F.2d 361, 367 (2d Cir. 1979)).

Defendants are not automatically entitled to an instruction about multiple conspiracies. Only when such an instruction is supported by the facts need a court provide such an instruction. See Mills, 995 F.2d at 485; United States v. Crockett, 813 F.2d 1310, 1316 (4th Cir. 1987). That some of the actors in the conspiracy did not know each other does not change the conclusion. Members of a single conspiracy need only be aware of the larger conspiracy. See United States v. Richards, 737 F.2d 1307, 1309 (4th Cir. 1984).

A multiple conspiracy instruction is not required unless the evidence at trial shows that defendants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment. See Kennedy, 32 F.3d at 884. Moreover,"[e]ven if the evidence were read to support a multiple conspiracy instruction, the district court's failure to give such an instruction is not reversible error `unless the defendants demonstrate that they have been prejudiced by the variance between the single conspiracy charged in the indictment

18

and the multiple conspiracies proven at trial.'" Id. at 884 n.1 (quoting United States v. Curry, 977 F.2d 1042, 1052 (7th Cir. 1992)).

Indeed, when a defendant alleges a variance between pleadings and proof based upon evidence of supposed multiple conspiracies the defendant must show that the variance infringed upon a "substantial right" and thereby resulted in actual prejudice. See id. at 883. In other words, the defendant must show that evidence of multiple, separate conspiracies likely confused the jury, causing it to "transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." Id.

We need not address the issue of whether Rollack's "substantial rights" were prejudiced, because we believe the district court's refusal to give the multiple conspiracies' instruction was not clearly erroneous. While it is conceivable that the Rollack/Conspirator 1 trips to Pittsburgh constituted one conspiracy, the Rollack/Conspirator 1/Conspirator 2 dealings were another, and the Rollack/Conspirator 2 conversations were yet a third, the facts presented show that Rollack was the central figure uniting these groups in one large conspiracy. And where the facts presented at trial show one individual working with different groups, which are aware of one another, it is not clearly erroneous for the district court to refuse to give a multiple conspiracies instruction. See id. at 884.

VII.

The seventh, and last, ground for appeal raised by Rollack is that the district court erred in applying sentencing enhancements for a leadership role in the conspiracy, and for obstruction of justice, despite a lack of evidence with sufficient indicia of reliability. The standard of review regarding factual findings by the district court during the sentencing of a defendant is whether the court was clearly erroneous in its findings. See United States v. Melton, 970 F.2d 1328, 1332-33 (4th Cir. 1992); United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989). When the sentencing issue on appeal raises "purely legal issues," the standard of review is de novo. Daughtrey, 874 F.2d at 217-18.

Adjustments for a defendant's role in the offense cannot be based on the conduct of a coconspirator or a co-defendant. See United States

19

v. Moore, 29 F.3d 175, 176 (4th Cir. 1994). In other words, Rollack should be judged on "an individualized determination of [his] culpability." Id.

Rollack contends that the evidence at trial established that in his dealings with Conspirator 1 and Conspirator 2 he was nothing more than "muscle," not the leader. It was Conspirator 2 and Conspirator 1 who were managing and leading the transactions and conspirators, Rollack contends.

According to the presentence report prepared by the United States Probation Office, "Peter Rollack was the organizer and leader of a drug conspiracy in the Western District of North Carolina and else-where," and "Mr. Rollack organized a gang known as `Sex, Money and Murder' which later became a `blood' gang."

Testimony at trial supported these findings. To be sure, on trips to Pittsburgh and North Carolina, Rollack worked as an enforcer. However, he also contributed capital for drug purchases. Further, on the third and final trip to North Carolina, half of the drugs in the Nissan Quest were Rollack's and half were Conspirator 1's.

If this was all of the evidence indicating Rollack's leadership, then the application of the enhancement might be a close call. However, there was much more. When Conspirator 4 failed to pay his drug debt, it was Rollack who made the decision that Conspirator 4 was to be killed. When Rollack, Conspirator 1 and Conspirator 2 were released while the police were conducting a search of their vehicle in Rockingham, it was Rollack who made the decision that the three men should wait for the van to be released rather than fleeing.

Furthermore, Rollack was the leader of SMM during the period alleged in the indictment. SMM was supplying kilograms of cocaine powder and cocaine base that were being distributed in New Jersey, Pittsburgh and North Carolina. The testimony of Agent Tadeo during the sentencing hearing further established that Rollack continued to exercise control and maintain his leadership position in SMM after he was transported to a North Carolina jail.

Even after the episode in Rockingham, Rollack continued to exercise direct influence over the North Carolina drug trade through his

20

associates. In early 1996, Conspirator 2 was purchasing quantities of crack cocaine from Conspirator 5. Rollack telephoned Conspirator 2 in Charlotte. Rollack explained that the kilogram and a half of crack cocaine that Conspirator 5 fronted to Conspirator 2 actually belonged to Rollack, and that he wanted his money. Given the extensive nature of this evidence, we cannot say the district court was clearly erroneous in applying the leadership enhancement.

Regarding the obstruction of justice enhancement, Rollack objected to this in his presentence report. The court applied this enhancement, though, finding that the letters and writings seized from Rollack's jail cell and mail "reflect continuing, ongoing exultations to gang members in New York to kill witnesses."

It is appropriate for a district court to apply an obstruction of justice enhancement when a "defendant either threaten[s] the codefendant, witness, or juror in his or her presence or issue[s] the threat in circumstances in which there is some likelihood that the codefendant, witness, or juror will learn of the threat." United States v. Brooks, 957 F.2d 1138, 1149-50 (4th Cir. 1992). Rollack contends that the obstruction adjustment should not apply in his case because, like in Brooks, there is no evidence that the threatened witness knew of Rollack's threats, nor that Rollack acted on his threats.

At the sentencing hearing Agent Tadeo testified about a letter sent by Rollack in September, 1997 to SMM associates in New York with instructions for gang members to kill David "Twin" Mullins, because Rollack believed that Twin was a potential witness against him. A second, similar letter from Rollack was read at a meeting in New York during November, 1997. Twin was later murdered in the Bronx on Thanksgiving Day, 1997.

Agent Tadeo further testified about the contents of letters seized from Rollack's jail cell. One letter contained a "to do" list, instructing fellow gang members not to use their real names and urging them to kill "snitches." Another letter instructed an associate to "keep the circle tight" and "to take care of all of the orders to kill." Agent Tadeo, who had reviewed hundreds of letters seized from Rollack's cell, testified that it was his opinion that Rollack was attempting to maintain control of SMM through the letters. Agent Tadeo also testified that after seizing

21

the letters and learning of Rollack's instructions that cooperating witnesses should be killed, it became necessary to relocate Conspirator 5, a cooperating witness who later testified at Rollack's trial.

In fashioning his argument that his case is similar to the one in Brooks, Rollack conveniently disregards, as he must, the portion of Brooks which says obstruction adjustments are appropriate when the threat is issued in "circumstances in which there is some likelihood that the codefendant, witness, or juror will learn of the threat." Based on the defendant's history of crimes of violence and the murder of Twin on Thanksgiving Day, 1997, there was a considerable likelihood that cooperating witnesses (Conspirator 5 in particular) and government informants were likely to learn of the defendant's threats. Rollack knew the instructions in the letters were going to be shared with his associates, and it was his purpose to silence those, whether it be through death or coercion, who were going to turn on him. We cannot say the trial court was in error in applying this enhancement.

VIII.

In conclusion, we find no error, reversible or otherwise, in the district court's various rulings. Appellant's conviction and sentence is, hereby,

AFFIRMED.

22